**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LEONARD EDELSON, | CIVIL ACTION NO. 13-5870 (JLL) |
| Plaintiff, | **OPINION** |
| v. | |
| STEPHEN CHEUNG, | |
| Defendant. | |

**LINARES**, Chief District Judge

Currently pending before the Court is the motion by the plaintiff, Leonard Edelson, pursuant to Federal Rule of Civil Procedure 56 (hereinafter, "Rule 56") for summary judgment in his favor on his claims for breach of contract (hereinafter, "the Breach Of Contract Claim"), unjust enrichment (hereinafter, "the Unjust Enrichment Claim"), breach of the covenant of good faith and fair dealing (hereinafter, "the Breach Of Good Faith Claim"), fraud (hereinafter, "the Fraud Claim"), and fraudulent transfer (hereinafter, "the Fraudulent Transfer Claim"). (ECF No. 233.) Also pending before the Court is the cross-motion by the defendant, Stephen Cheung, pursuant to Rule 56 for summary judgment in his favor as to all of Edelson's aforementioned Claims. (ECF No. 244.)

The Court heard oral argument on the motion and the cross-motion. (ECF No. 252.) For the following reasons: (1) summary judgment is entered in favor of Cheung as to the Breach Of Contract Claim, the Unjust Enrichment Claim, and the first part of the Fraud Claim (hereinafter, "the First Part Of The Fraud Claim"); (2) summary judgment is denied to both parties as to the Breach Of Good Faith Claim and the second part of the Fraud Claim (hereinafter, "the Second Part Of The Fraud Claim"), which may now proceed to trial; and (3) the Fraudulent Transfer Claim is dismissed as being withdrawn.[1]

---

[1] The following substantive papers were filed under these designated Electronic Case Filing docket entries in relation to the motion and cross-motion for summary judgment:

| | |
|---|---|
| 233: | Edelson's notice of motion |
| 233-1: | Edelson's brief in support of the motion |
| 233-2: | Edelson's statement of undisputed material facts |
| 244: | Cheung's notice of cross-motion |
| 245: | Cheung's brief in support of the cross-motion and in opposition to Edelson's motion |
| 246: | Cheung's statement of undisputed material facts |
| 247 – 247-4: | Cheung's affirmation and supporting exhibits |
| 248 – 248-10: | Cheung's declaration and supporting exhibits |
| 249: | Edelson's brief in reply and in opposition to Cheung's cross-motion |
| 249-1: | Edelson's reply declaration |
| 249-2: | Edelson's response to Cheung's statement of undisputed material facts |
| 252: | Transcript of the oral argument conducted by the Court. |

Furthermore, the Court reviewed the initial complaint (ECF No. 1), the first amended complaint and the supporting exhibits (ECF No. 41 through ECF No. 41-4), and the second amended complaint and the supporting exhibits (ECF No. 184 through ECF No. 184-4). The Court will cite to these documents in its discussion in this Opinion.

# I.   BACKGROUND

The Court presumes that the parties are familiar with the factual context and the extensive procedural history of this action, and thus only the facts that are necessary to resolving the motion and cross-motion will be provided here. (*See* ECF Nos. 83, 84 (September 2015 Opinion and Order denying Edelson's motion for a preliminary injunction); ECF Nos. 157, 158 (January 2017 Opinion and Order of the Magistrate Judge granting Edelson's motion for sanctions against Cheung in part); ECF Nos. 181, 182 (September 2017 Opinion and Order of the Magistrate Judge granting Edelson's motion to amend the complaint in part); ECF No. 201 (January 2018 Order denying Edelson's motion for entry of default judgment).)

## A.   Facts

Since 1976, Edelson had owned a business that operated in New Jersey known as Westchester Lace & Textiles, Inc. (hereinafter, "Westchester Lace"), which at one time manufactured lace in its New Jersey factory and then sold the lace to garment manufacturers. (ECF No. 184 at 3.) In or around 2003 or 2004, Edelson formed a business in Jiangmen, China with three other people — Cheung, Stephen Ma, and C.K. Chiu — known as Eastchester Lace & Textiles Ltd. (hereinafter, "EL-China"), which would manufacture and be the sole supplier of the lace for Westchester Lace. (*Id.* at 4; ECF No. 41-1 at 2, 4.) Edelson possessed a 50% ownership interest in EL-China,

whereas Ma, Chiu, and Cheung owned 16 2/3% each. (ECF No. 184 at 5; ECF No. 41-1 at 2, 7.)

Ma, Chiu, and Cheung established EL-China in China as a corporation due to their familiarity with business procedures in that country, with Cheung and a relative (hereinafter, "Cheung's Relative") acting as the managers of EL-China. (ECF No. 184 at 4, 6; ECF No. 233-1 at 9.) In turn, Edelson provided EL-China with the following: (1) his lace-manufacturing expertise; (2) Westchester Lace's name, contacts, methods, and lace designs; (3) over 133,000 pounds of yarn and several machines, parts, and pieces of equipment; and (4) a consultant (hereinafter, "the Consultant") — who Edelson paid over $250,000 to relocate to China to set up the EL-China facilities, to hire EL-China's employees, and to provide training on the use of the lace-manufacturing machinery — because Ma, Chiu, and Cheung had no experience in the lace industry. (ECF No. 184 at 4–5; ECF No. 41-1 at 2; ECF No. 233-1 at 9.)

EL-China would provide the finished lace to Westchester Lace, which would in turn sell the finished lace to Westchester Lace's customers. (ECF No. 184 at 5-6; ECF No. 41-1 at 2 (stating that "Westchester [Lace] shall have priority in purchasing lace from [EL-China]").) Edelson's goal in participating in the establishment of EL-China was to create a lace-manufacturing source for Westchester Lace, while simultaneously maintaining some level of control over the manufacturing process itself. (ECF No. 233-1 at 9.)

In 2005, Cheung notified Edelson, Ma, and Chiu in a letter that the Bank of China sought repayment of loans that EL-China had taken out, and that the bank had seized several of EL-China's machines that Cheung was forced to buy back at auction with his own funds. (ECF No. 184 at 6; ECF No. 41-1 at 25, 27.) Cheung offered to manage these financial issues and restore EL-China's reputation if he were to be granted full ownership of EL-China. (ECF No. 184 at 7; ECF No. 41-1 at 25.) As a result, Edelson, Ma, and Chiu each signed a contract (hereinafter, "the 2005 Conveyance Contract"), wherein they agreed to convey their interests in EL-China to Cheung, even though the business arrangement between Westchester Lace and EL-China remained in place. (ECF No. 184 at 7; ECF No. 41-1 at 29; *see also* ECF No. 233-2 at 7 (Edelson admitting that he signed the 2005 Conveyance Contract without any future conditions).) Cheung then transferred 10% of his interest in EL-China to one of his sons for the alleged purpose of complying with a certain Chinese law, but he failed to advise Edelson of same. (ECF No. 184 at 10–11.)

In September 2006, Edelson and Cheung entered into a separate one-paragraph agreement that allowed Edelson to exercise an option (hereinafter, "Edelson's Option") for a 50% interest in EL-China (hereinafter, "the 2006 Option Agreement"). (ECF No. 184 at 9.) The 2006 Option Agreement stated the following in full:

> Leonard Edelson has transferred machinery and yarn and consultant services in excess of $600,000 to [EL-China]. In as much as [Cheung] will own 100% of the shares after the company is reorganized, [Cheung] agree[s] to give 50% interest in that company or a successor company to

> Leonard Edelson at a date specified by him. He may exercise this option at any time.

(ECF No. 248-4 at 2; *see also* ECF No. 158 at 1–2 (Opinion entered in January 2017 discussing same).) Edelson asserts that Cheung agreed to enter into the separate 2006 Option Agreement after Edelson expressed trepidation about having entered into the 2005 Conveyance Contract. (*See* ECF No. 233-2 at 7–9; *see also* ECF No. 245 at 7 (Cheung pointing out that the 2006 Option Agreement was signed several months after the 2005 Conveyance Agreement was executed).) Edelson then continued to pay for the Consultant to assist EL-China in its lace-manufacturing operations for several years. (ECF No. 233-1 at 11.) The Court emphasizes at this juncture that the 2005 Conveyance Contract was entered into without the benefit of Edelson's Option being provided to Edelson, and that Edelson's Option came about later, *i.e.*, in 2006, as a result of the 2006 Option Agreement. (ECF No. 252 at 16 (Edelson's counsel acknowledging same at oral argument).)

From 2006 through the middle of 2013, Cheung and Cheung's Relative managed EL-China and drew salaries therefrom. (ECF No. 184 at 12.) Throughout this time period, Edelson continued to pay the Consultant for his consulting services to EL-China. (ECF No. 41-2 at 28 (Edelson indicating in an e-mail exchange with Cheung from July 2013 that Edelson was still paying for the Consultant); *see also* ECF No. 233-1 at 11; ECF No. 233-2 at 12.) Edelson also continued to purchase lace from EL-China, thereby providing EL-China with revenue. (ECF No. 233-2 at 12.)

In March 2009, Cheung told Edelson that an outside investor sought to provide additional funding to EL-China, but Edelson objected in the following written e-mail to Cheung:

> I was just thinking about this man that wants to invest ... in to [EL-China]. I have invested all the machinery ..., starting yarn ..., misc. parts and equipment ..., [money] that I gave to ... Ma which he used for [EL-China], $250,000 in salary which I have paid to [the Consultant] in order to set up and teach [EL-China]. Now he wants a board that he believes he could get to control and does not include me. Please advise if my understanding that I am a partner in [EL-China] is incorrect so that as I said before I can make the necessary arrangements to protect myself and Westchester [Lace].

(ECF No. 41-1 at 33.)

Cheung responded to Edelson's concerns with the following e-mail:

> Don't worry about what was going on with that man .... Not only you disagreed, I never agree to have him join [EL-China]. We had been suffering a lot of BS and difficulties with [EL-China] and now we all seeing the sun is rising. You are the only partner at [EL-China] and I am sure in a short period (1 or 2 years), we will make up what we had invested.

(ECF No. 41-1 at 33.)

However, Edelson alleges that in 2012, Cheung surreptitiously began negotiating the sale of EL-China to a person named Hang Chen without informing Edelson. (ECF No. 184 at 13.) Furthermore, in April 2013, while Cheung was engaged in discussions with Chen and without informing Edelson, Cheung established a business to sell lace and textiles named Eastchester Lace Corp. in New York (hereinafter, "EL-NY") that would

directly compete with Westchester Lace. (ECF No. 41-2 at 6–9; ECF No. 233-1 at 12.)

Edelson alleges that Cheung hired Geremy Bernstein, who was an employee of

Westchester Lace, in order to assist EL-NY in starting up its operations. (ECF No. 184 at

13–14; *see also* ECF No. 41-2 at 33–34 (e-mail from Bernstein to Cheung from July 2013

indicating he had been hired by Cheung at some point previously); ECF No. 233-1 at 12,

14.)

     In June 2013, Cheung forwarded to Edelson an e-mail from Cheung's Relative,

which detailed the financial problems that were allegedly afflicting EL-China. (ECF No.

184 at 14; ECF No. 41-2 at 11–12; ECF No. 233-1 at 12.) Edelson responded by e-mail

that he wanted to meet with Cheung about these problems and the potential sale of EL-

China, but Cheung either rebuffed these requests or indicated that he was actively in the

process of seeking a buyer for EL-China. (ECF No. 184 at 14–18; ECF No. 41-2 at 14,

19, 22.) In fact, in an e-mail dated June 17, 2013, Cheung advised Edelson that he was

meeting with a potential buyer and he asked Edelson, "What price would you suggest that

I should ask for?" (ECF No. 249-1 at 65.) Furthermore, Cheung e-mailed Edelson

several times between July 7, 2013 and July 15, 2013, and indicated that he was still

meeting with potential buyers of EL-China. (ECF No. 41-2 at 26, 28.) However, Cheung

actually sold EL-China on June 3, 2013 for $100,000 without informing Edelson. (ECF

No. 184 at 15; ECF No. 41-2 at 16; ECF No. 233-1 at 13; ECF No. 248-6 at 2.) The

Court notes that in none of the aforementioned communications between Cheung and

Edelson is there any indication that Edelson sought to exercise Edelson's Option set forth in the terms of the 2006 Option Agreement.

Edelson was still unaware that Bernstein had been hired by Cheung as of July 25, 2013, as Edelson e-mailed Cheung on that date to "advise [Cheung] that Geremy resigned from the company." (ECF No. 41-2 at 35.) Rather than admit to Edelson at that point that he had hired Bernstein, Cheung's e-mail response was the following: "He is working with other company?" (*Id.*)

Furthermore, at around this time, Chen at Cheung's behest accelerated the dates that Edelson's payments for the manufactured lace were due to EL-China. Cheung then proceeded to: (1) cut off Edelson's supply of lace from EL-China; (2) seek to acquire Westchester Lace's customers; (3) advise Chen that he should no longer engage in any business with Westchester Lace; (4) copy Westchester Lace's lace patterns; (5) sell the machinery that Edelson had provided for the benefit of EL-China; and (6) tell Chen to refuse to take any further orders from Westchester Lace. (ECF No. 184 at 22–30; ECF No. 41-2 at 37–38; *see also, e.g.,* ECF No. 41-4 at 5–6 (Cheung advising Bernstein in an e-mail from January 2014 that Cheung would be advising certain customers of Westchester Lace that EL-China was no longer in a business relationship with same); ECF No. 249-1 at 89 (July 15, 2013 e-mail from Bernstein to Cheung advising Cheung to hold off on "put[ting] the death blow on [Edelson]" until certain matters were finalized); ECF No. 249-1 at 91 (July 23, 2013 email from Bernstein to Cheung advising Cheung

that Bernstein would now inform Edelson that he was quitting his employment at Westchester Lace, and suggesting Edelson "is going to be hit right between the eyes tomorrow"); ECF No. 184-3 at 49–54 (Cheung directing Chen and Bernstein in e-mails to seek to recover all outstanding debts owed by Westchester Lace to EL-China immediately, and to take new orders from Westchester Lace but to not ship them in order to cut Edelson out by offering the finished lace products directly to Edelson's customers); ECF No. 184-3 at 17 (e-mail from October 2013 from Cheung advising those associated with EL-China, including Bernstein, to not fill any orders for Westchester Lace).) Chen then e-mailed Westchester Lace's customers directly to inform them that they should direct their orders to EL-China and that EL-China would no longer accept orders through Westchester Lace. (ECF No. 184 at 22–30; ECF No. 41-4 at 23–31.)

According to Edelson, Cheung was behaving in this manner in an effort to force Westchester Lace out of business for the benefit of EL-China and EL-NY. (ECF No. 184-4 at 2–3 (January 21, 2014 e-mails from Cheung to those connected to Chen and EL-China that his goal was to take away all of Westchester Lace's customers).) Indeed, Cheung went so far as to eventually advise Chen and those connected to EL-China of the following: "PLEASE DO NOT SEND OUT ANY SHIPMENT FOR [Westchester Lace]; NO MATTER THEY PAID OR NOT." (ECF No. 184-4 at 9 (as stated in a February 6, 2014 e-mail).)

On August 1, 2013, Edelson learned that Bernstein was now working for EL-NY. (ECF No. 184 at 19; ECF No. 41-2 at 47.) Edelson then sent an e-mail to Cheung to advise that he (meaning Edelson) was now aware of this betrayal, and he further stated: "Before I exercise that [2006 Option Agreement,] please send me [certain documents]." (ECF No. 41-2 at 47.) Edelson did not actually exercise Edelson's Option at this time.

Edelson alleges that he indeed exercised Edelson's Option under the 2006 Option Agreement on or around August 9, 2013. (ECF No. 252 at 23.) Even if this were true, however, this occurred more than two months after Cheung had already sold EL-China to Chen, and thus it is undisputed that Edelson did not exercise Edelson's Option before EL-China was sold. (*Id.* (Edelson's counsel acknowledging the same during oral argument).)

On August 21, 2013, Edelson acknowledged in an e-mail that Chen was the now owner of EL-China. (ECF No. 41-3 at 16.) However, as of August 22, 2013, the Consultant was still working for Cheung and Chen, even though Edelson was paying for the Consultant's services up to that point. (ECF No. 41-3 at 24 (August 22, 2013 e-mail indicating that the Consultant advised someone connected to EL-China that Edelson was intending to visit China soon).) In addition, in another e-mail exchange dated August 22, 2013 not involving Edelson, Chen and Cheung acknowledged that the lace-manufacturing machinery contributed by Edelson to EL-China had been sold without Edelson's knowledge, and that Edelson should be misled about that fact and told that the machines had simply been moved elsewhere. (ECF No. 41-3 at 26–30.)

11

## B.    Claims

In October 2013, Edelson brought this action against only Cheung and asserted only the Breach Of Contract Claim and Breach Of Good Faith Claim.  (ECF No. 1.) Edelson filed an amended complaint in April 2015, again naming only Cheung and adding the Fraud Claim and the Unjust Enrichment Claim.  (ECF No. 41.)

In the current second amended complaint, Edelson now asserts five causes of action against Cheung.  In the Breach Of Contract Claim, Edelson alleges that Cheung breached the 2006 Option Agreement by refusing to comply with the obligation to convey a 50% interest in EL-China under Edelson's Option "when Edelson requested such transfer."  (ECF No. 184 at 33.)  Edelson also alleges that as consideration for that Agreement, Edelson agreed to continue to engage in business with EL-China and to continue to provide and pay for the Consultant.  (*Id.*)

In the Breach Of Good Faith Claim, Edelson alleges that Cheung transferred the ownership of EL-China without Edelson's prior knowledge or permission, "refus[ed] to offer Edelson a right to purchase [EL-China] before purportedly selling it to another entity," directed those overseeing EL-China to stop dealing with Edelson and Westchester Lace, and diverted sales that otherwise would have gone to Edelson and Westchester Lace.  (*Id.* at 34.)

In the Unjust Enrichment Claim, Edelson alleges that he transferred his ownership interest in EL-China to Cheung based on Cheung's representations that he could exercise

Edelson's Option at any time as long as Edelson continued to (a) pay for the Consultant, and (b) purchase lace products from EL-China through Westchester Lace. (*Id.* at 36–37.) Edelson further alleges that Cheung has been unjustly enriched by his failure to compensate Edelson for the benefits that Edelson conferred upon Cheung over the course of their business relationship. (*Id.* at 37.)

In the Fraud Claim, Edelson's allegations concern two separate matters. In the First Part Of The Fraud Claim, Edelson alleges that Cheung transferred a 10% interest in EL-China to one of Cheung's sons, while simultaneously representing to Edelson that he (meaning Cheung) remained the sole owner after Edelson, Ma, and Chiu transferred their interests to Cheung. (*Id.* at 35.) In the Second Part Of The Fraud Claim, Edelson alleges that Cheung sold EL-China to Chen without informing Edelson, sold the lace-manufacturing machinery that had been contributed by Edelson without telling him, and withheld the date of sale and the circumstances thereunder, and that Cheung did all of this with the express goal of "deceiv[ing] Edelson from seeking to exercise his option to obtain 50% of [EL-China] or its successor." (*Id.* at 35–36.).

In the Fraudulent Transfer Claim, Edelson alleges that Cheung transferred his personal assets to various family members (hereinafter, "Family Members") with the goal of preventing Edelson from collecting on a potential judgment against Cheung. (*Id.* at 37–40.) As will be discussed herein, an assessment of the Fraudulent Transfer Claim is no longer of any moment.

13

## II.    DISCUSSION

It is not necessary for the Court to restate the standard for resolving cross-motions for summary judgment that have been made pursuant to Rule 56, because that standard has been already enunciated.  *See* Fed. R. Civ. P. 56(a) (providing for an award of summary judgment if there is no genuine dispute of material fact and the movant is entitled to judgment as matter of law); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (setting forth the general summary judgment standard); *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (setting forth the standard for resolving cross-motions for summary judgment); *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 270 (3d Cir. 2006) (setting forth the same).

### A.    The Earlier Preliminary Injunction Opinion

In an Opinion issued in 2015 at the initial stages of this litigation, the Court denied Edelson's motion for the entry of a preliminary injunction against Cheung (hereinafter, "the Injunction Opinion").  (ECF No. 83.)  In the Injunction Opinion, the Court found that Edelson had not demonstrated a likelihood of success on the merits at that juncture. (*Id.* at 13–14.)  Cheung argues that the language from the Injunction Opinion is controlling at this summary-judgment stage of the litigation.  (*See* ECF No. 245 at 10 (Cheung arguing that in denying the preliminary injunction, "this court held that such relief was unwarranted because plaintiff has not demonstrated a likelihood of success on

his breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment and fraud claims"); *see also id.* at 5 (arguing the same); ECF No. 252 at 53 (Cheung's counsel arguing the same during oral argument for the motion and cross-motion for summary judgment).)

However, the Court's early determination concerning the preliminary-injunction motion from the Injunction Opinion has no bearing on the Court's determination concerning the pending motion and cross-motion for summary judgment. The Court employs two completely different standards in addressing those kinds of motions. *See Bruni v. City of Pittsburgh,* 824 F.3d 353, 361 n.11 (3d Cir. 2016) (holding that "the standards governing a motion for a preliminary injunction and a motion for summary judgment are entirely different"); *Doebler's Pa. Hybrids, Inc. v. Doebler,* 442 F.3d 812, 820 (3d Cir. 2006) (holding that the manner in which a district court addresses a motion for preliminary injunction "is irrelevant" to the manner in which a later-filed summary judgment motion is addressed, as there is a "distinction between the standards for summary judgment and preliminary injunction"). This is because the inferences and conclusions that are drawn by a court in weighing the available evidence at a preliminary stage in a case are inappropriate to use to determine the outcome of a subsequently-filed summary-judgment motion after discovery has been conducted. *See Doebler,* 442 F.3d at 820 (holding that the inferences that "were previously made in ruling on [a] motion for preliminary injunction cannot determine [a] Rule 56(c) motion").

Those preliminary inferences and conclusions "should not be used to support propositions that underpin the decision to grant [or deny] the motion for summary judgment" based on whether there are genuine issues for trial. *Id.* at 820. Therefore, this Court concludes that its findings in the Injunction Opinion do not control its determination here on the issue of an award of summary judgment.

## B.   Answer Status

Edelson argues that Cheung should be barred from denying the factual allegations asserted against him by Edelson in the second amended complaint, because Cheung's earlier answer was struck in January 2017 by the Magistrate Judge as a sanction for Cheung's failure to abide by discovery requests. (ECF No. 233-1 at 7, 24, 26, 28; *see also* ECF No. 158 at 10–11 (January 2017 Order striking Cheung's earlier answer).) At the time that Cheung's earlier answer was struck, Edelson's operative complaint, *i.e.*, his first amended complaint, only asserted claims against Cheung that entailed the Breach of Contract Claim, the Unjust Enrichment Claim, the Breach of Good Faith Claim, and the Fraud Claim. (ECF No. 41.)

However, after Cheung's earlier answer was struck, Edelson filed a second amended complaint under this action, in which Edelson: (1) realleged the aforementioned four Claims; (2) added the Fraudulent Transfer Claim against Cheung, wherein Edelson alleged that Cheung had fraudulently transferred his personal assets to the Family Members in order to put those assets out of Edelson's reach for an eventual execution of

a potential judgment against Cheung; and (3) added fraudulent transfer claims against the Family Members as well. (ECF No. 184; *see also* ECF No. 181 (September 2017 Opinion issued by the Magistrate Judge granting Edelson's motion to amend his allegations in part).) Cheung filed a new answer in response to that second amended complaint. (ECF No. 193.)

The Court rejects Edelson's argument on this issue, and holds that Cheung's new answer is now the operative answer. By filing the second amended complaint within the contours of the instant action, Edelson opened the door to providing Cheung an opportunity to file a new answer. *See Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999) (holding that an amended complaint opens the door for defendants to answer anew); *Perez v. El Tequila, LLC*, No. 12-588, 2015 WL 11144033, at *3 (N.D. Okla. July 20, 2015) (holding that the filing of an amended complaint gave the defendants an opportunity to file an amended answer, and chastising the defendants for not availing themselves of that opportunity); *Heckler & Koch, Inc. v. German Sport Guns GmbH*, 71 F. Supp. 3d 866, 878 (S.D. Ind. 2014) (holding that an amended answer supersedes a previous answer); *Christiansen v. Lincoln Nat'l Life Ins. Co.*, No. 08-3948, 2010 WL 11515268, at *1 n.1 (C.D. Cal. Aug. 3, 2010) (denying plaintiff's motion to strike defendant's answer, as filing an amended complaint rendered the original answer inoperative); *Cowart v. City of Eau Claire*, 571 F. Supp. 2d 1005, 1008 (W.D. Wisc. 2008) (holding that an original answer becomes moot upon the filing of an amended

complaint).

If Edelson desired that the striking of Cheung's earlier answer should carry forward, then the better course would have been for Edelson to bring a separate lawsuit against Cheung and the Family Members concerning the issue of the alleged fraudulent transfer of assets, and then for Edelson to move to consolidate that separate action with the instant action. But more importantly, the Court is guided and constrained in reaching this holding by well-settled Third Circuit precedent that mandates that it is "prefer[able] that cases be decided on their merits." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194–95 (3d Cir.1984); *see also Hildebrand v. Allegheny Cty.*, No. 18-1760, 2019 WL 1783540, at *3 (3d Cir. Apr. 24, 2019) (upholding the "strong policy favoring decisions on the merits"); *McMullen v. Bay Ship Mgmt.*, 335 F.3d 215, 217 (3d Cir. 2003) (emphasizing the policy of favoring the resolution of litigation on the merits). Nonetheless, the Court in its discretion holds that all of the other discovery sanctions, monetary sanctions, and adverse-inference charges imposed by the Magistrate Judge against Cheung shall remain in place. (ECF No. 157; *see also* ECF No. 252 at 9–10 (discussing same at oral argument for the motion and cross-motion for summary judgment).)

## C. Breach Of Contract Claim

### 1. Whether a contract existed

Edelson alleges that Cheung breached the terms of the 2006 Option Agreement.

(ECF No. 184 at 33.) However, for a valid contract to even exist, there must be: (1) an offer to act or forebear made by the offeror; (2) an acceptance by the offeree of the offer; and (3) consideration paid by the offeree to the offeror in exchange for the offeror's performance. *See Taha v. Tires Plus*, No. 10-4118, 2011 WL 2293330, at *3 (D.N.J. June 8, 2011). It is appropriate for the Court to determine whether a contract exists as a matter of law. *See J.I. Hass Co. v. Gilbane Bldg. Co.*, 881 F.2d 89, 92 (3d Cir. 1989) (citations omitted).

Contrary to the arguments raised by Cheung (*see generally* ECF No. 245), the Court finds that that the 2006 Option Agreement gave rise to a valid contract in that: (1) Cheung offered Edelson an option to claim a 50% interest in EL-China, *i.e.*, Edelson's Option, in order to allay Edelson's concerns about the fact that Cheung now controlled the source of Edelson's livelihood, because it is apparent that Cheung wanted the business relationship with Westchester Lace to continue; (2) Edelson accepted that offer, because it is apparent that he desired to maintain an interest in EL-China, as he wanted to have EL-China continue to produce lace for him for the benefit of Westchester Lace; and (3) Edelson agreed to pay for the Consultant as consideration in exchange for Cheung's offer concerning Edelson's Option, even though Cheung was now in control of EL-China, as Cheung needed that Consultant because Cheung was not experienced in the area of lace manufacturing. (*See* ECF No. 233-1 at 26–27.) It is in line with common sense for the Court to find that Edelson continued to pay for the Consultant because

Edelson still had a business interest in EL-China's success and survival in the lace-manufacturing industry. Furthermore, the Court's assessment of the presence of the consideration given by Edelson underlying the 2006 Option Agreement is consistent with the expansive interpretation of the elements of a contract, including the element of consideration, by the courts in New Jersey. *See MacWilliams v. BP Prods. N. Am. Inc.*, No. 09-1844, 2010 WL 4860629, at *5 (D.N.J. Nov. 23, 2010) (holding that a court should consider all of the relevant evidence that may assist in determining the intent and meaning of a contract). Therefore, the continued existence of this business arrangement was important and of value to both Cheung and Edelson, and the 2006 Option Agreement comprised a contract.

### 2. Whether there was a breach

Edelson argues that he exercised Edelson's Option under the terms of the 2006 Option Agreement, and that Cheung's failure to honor his demand to exercise said option constituted a breach. (ECF No. 233-1 at 28.) Edelson points to his August 1, 2013 e-mail to Cheung, wherein he stated: "Before I exercise that [2006 Option Agreement,] please send me [certain documents]." (ECF No. 248-5 at 2.)

However, in viewing this evidence in the light most favorable to Edelson, the Court finds that this statement does not indicate that Edelson was exercising Edelson's Option at that time, as he indicates that he wanted to see certain documents *before* he decided whether to exercise that Option. (*See* ECF No. 245 at 8 (Cheung arguing the

same); *see also id.* at 17–18 (arguing the same).) Indeed, Edelson admitted in his own deposition testimony that he never exercised the Option. (*See* ECF No. 247-3 at 61–62 (Edelson testifying that he had not exercised Edelson's Option as of August 2013 because he wanted to first determine if EL-China had enough value at that point to make it worth exercising the Option); *see also* ECF No. 194 at 3 (Edelson admitting in a declaration filed on November 21, 2017 that Cheung sold EL-China "without allowing me to exercise my option").) Thus, Edelson never actually exercised his right under the 2006 Option Agreement. Furthermore, Edelson's Option was no longer available to be exercised against Cheung as of August 2013, as Cheung had sold EL-China to Chen two months prior, which Edelson's counsel acknowledged at oral argument herein. (ECF No. 252 at 23, 30–31.)

Therefore, the Court concludes that even though the 2006 Option Agreement comprised a contract, Cheung did not breach that Agreement. As a result, the Court will award summary judgment in favor of Cheung and against Edelson as to the Breach Of Contract Claim.

## D.    Unjust Enrichment

Even though the Court has held that Cheung is entitled to summary judgment on the Breach of Contract Claim, the Court has held nevertheless that the 2006 Option Agreement between Edelson and Cheung comprised a contract. As a matter of law, an unjust enrichment claim is unavailable when the relationship between the parties at issue

is founded upon a contract. *See Cook v. Gen. Nutrition Corp.*, 749 F. App'x 126, 129 (3d Cir. 2018) (holding the same); *see also Estate of Gleiberman v. Hartford Life Ins. Co.*, 94 F. App'x 944, 947 (3d Cir. 2004) (holding that a claim for unjust enrichment is only supportable when the parties' rights are not governed by a contract); *Urbino v. Ambit Energy Holdings, LLC*, No. 14-5184, 2015 WL 4510201, at *7 (D.N.J. July 24, 2015) (dismissing an unjust enrichment claim because a contract governed the relationship of the parties).

Here, the relationship at issue between Edelson and Cheung is founded upon a contract, *i.e.*, the 2006 Option Agreement. As a result, the Unjust Enrichment Claim is unavailable to Edelson here, and thus summary judgment is entered in favor of Cheung and against Edelson on this Claim. Indeed, counsel for Edelson acknowledged this as a potential determination at oral argument. (ECF No. 252 at 12.)

### E. Breach Of Good Faith Claim

In a business relationship, subterfuges and evasions on the part of a defendant are violative of the covenant of good faith and fair dealing, even if that defendant actor is of the belief that such conduct was justified. *See City of Atl. City v. Zemurray St. Capital, LLC*, No. 14-5169, 2017 WL 6638203, at *16 (D.N.J. Dec. 29, 2017) (holding the same). Furthermore, in addition to presenting evidence that a defendant acted in bad faith, the plaintiff must show that the alleged bad-faith conduct caused the plaintiff to suffer damages by depriving the plaintiff of the benefit of a bargain that was intended by the

parties. *See China Falcon Flying Ltd. v. Dassault Falcon Jet Corp.*, 329 F. Supp. 3d 56, 74 (D.N.J. 2018).

Edelson has demonstrated that the record is replete with evidence of examples of bad-faith conduct on the part of Cheung that Edelson would not expect from someone with whom he thought he had a symbiotic business relationship. (ECF No. 233-1 at 30–31.) For instance, even though Cheung and Edelson were still — in Cheung's own words — "partners" in the operation of EL-China, and even though EL-China was created and supposed to be operated for the express purpose of providing lace to Westchester Lace, Cheung allegedly sought to benefit himself to Edelson's detriment by: (1) forming EL-NY; (2) taking customers who were being served by Edelson and Westchester Lace in order to benefit himself and EL-NY; (3) taking Edelson's employee Bernstein from Westchester Lace, and then conspiring with Bernstein to undermine Edelson; (4) accelerating the payments owed by Westchester Lace to EL-China and then refusing to sell lace to Westchester Lace; and (5) selling EL-China without first informing Edelson and then hiding the sale from Edelson for some time. (ECF No. 252 at 23–24.)

Edelson presents triable issues of fact as to whether Cheung failed to act in good faith to protect Edelson's interests, and as to whether Cheung failed to abide by his responsibility to do no harm to a person with whom he had a business arrangement, *i.e.*, Edelson. *See Irwin Katz & Assocs., Inc. v. Concepts in Health, Inc.*, No. 13-1217, 2014 WL 6471486, at *11–12 (D.N.J. Nov. 19, 2014) (finding there were triable issues of fact

on a breach of the covenant of good faith and fair dealing claim, where the plaintiff demonstrated that he reasonably expected that he would eventually profit from the defendant's sale of a business in which the plaintiff maintained an interest, and that the defendant acted in such a way as to deprive the plaintiff of that profit by withholding certain information and by not correcting the plaintiff's misapprehension that he would be entitled to compensation). However, Cheung has also raised genuine triable issues of fact as to whether Edelson is entitled to any damages on the Breach of Good Faith Claim, as Cheung argues that EL-China was not profitable and that the equipment contributed by Edelson was outdated and bordered on being worthless. (*See* ECF No. 252 at 56.) Thus, the Court will not grant summary judgment to either Edelson or Cheung on this Claim, and will leave the Breach of Good Faith Claim to be resolved by a trier of fact.

### F.  Fraud

The heightened pleading standard for the elements of a cause of action to recover damages for fraud are well-settled. *See* Fed. R. Civ. P. 9(b); *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (stating that a "plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation"); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997) (stating that a fraud claim must include "the 'who, what, when, where and how' elements"). Nevertheless, it bears mentioning for the purposes of this analysis that the elements of a fraud claim are: (1) a material misrepresentation of a

currently existing or past fact or omission of a material fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the plaintiff rely on the misrepresentation or omission; (4) reasonable reliance by the plaintiff on the misrepresentation or omission; and (5) resulting damages suffered by the plaintiff. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1186 (3d Cir. 1993).

Edelson's Fraud Claim is set forth in two parts. (ECF No. 252 at 40–45 (Edelson's counsel acknowledging same at oral argument).) In the First Part Of The Fraud Claim, Edelson alleges that Cheung never told him that Cheung transferred a 10% ownership interest in EL-China to Cheung's son, and that Edelson entered into the 2006 Option Agreement with the impression that Cheung maintained 100% control. (ECF No. 233-1 at 31.) But that alleged misrepresentation is not material, as it would not have prevented Edelson from exercising Edelson's Option if he had done so in a timely manner, as Cheung still had a 90% possessory interest in EL-China and thus Cheung would have been able to relinquish to Edelson the equivalent of 50% of the *total value* of El-China out of his personal 90% interest. Indeed, Cheung argues this in his papers in support of his cross-motion for summary judgment.. (ECF No. 245 at 23.) As a result, the First Part Of The Fraud Claim does not meet the required "material" element. *See Lightning Lube, Inc.*, 4 F.3d at 1186. Thus, the Court finds that Cheung is entitled to summary judgment in his favor against Edelson on the First Part Of The Fraud Claim.

However, Edelson alleges in the Second Part Of The Fraud Claim that Cheung behaved in a fraudulent and misleading manner in order to convince him to not attempt to exercise Edelson's Option until EL-China and all of its assets had been sold or liquidated. (ECF No. 233-1 at 31–32.) The Court finds that triable issues of fact remain as to the Second Part Of The Claim, because Edelson has put forth sufficient evidence to show that: (1) Cheung materially misrepresented the financial status of EL-China and that Edelson was still the only other "partner," when Cheung was arguably aware that EL-China was not financially sound, Cheung was actively seeking to sell EL-China without truly considering Edelson's input, and Cheung was starting up EL-NY to compete directly with Edelson; (2) Cheung knew that his representations to Edelson were a charade; (3) Cheung intended to have Edelson rely on his misrepresentations because Cheung needed Edelson to keep paying for the Consultant in order to keep EL-China operating; (4) Edelson reasonably relied on Cheung's statements, as they had been in business together for several years; and (5) Edelson suffered damages in the form of lost business to Westchester Lace, losing out on the value of equipment and supplies that he transferred to EL-China, lost business opportunities due to Cheung's conduct in swiping Edelson's customers, and loss of Edelson's reputation in the lace industry.

In addition, the Court concludes that Cheung has raised triable issues of fact on the Second Part Of The Fraud Claim, *e.g.*, he refutes whether Edelson indeed suffered any damages because the equipment was of little value and because Edelson must have

known that EL-China was not profitable due to the fact that it was bound to sell finished products to Westchester Lace at below-market prices, that require a final determination by a trier of fact. Therefore, the motion and the cross-motion for summary judgment on the Second Part Of The Fraud Claim are denied.

### G.    Fraudulent Transfer Claim

Edelson alleged in the Fraudulent Transfer Claim that Cheung fraudulently transferred his personal assets to Family Members in order to prevent Edelson from collecting on any potential judgment against Cheung. (ECF No. 184 at 37–40.) However, the transfer of those assets at issue have been reversed by Cheung, and the separate claims that Edelson had brought against the Family Members were settled on the record before the Magistrate Judge in August 2018. (ECF No. 232; *see also* ECF No. 243 (September 2018 Order embodying that settlement); ECF No. 233-1 at 7 (Edelson admitting that "Cheung [is] . . . the sole remaining defendant" in this action).) In addition, Edelson's counsel agreed at oral argument that the Fraudulent Transfer Claim should now be withdrawn. (ECF No. 252 at 7.) Therefore, the Court dismisses the Fraudulent Transfer Claim.

### III.    CONCLUSION

For the aforementioned reasons: (1) the Court grants summary judgment in favor of the defendant, Stephen Cheung, on the Breach Of Contract Claim, the Unjust

Enrichment Claim, and the First Part Of The Fraud Claim; (2) denies summary judgment to both parties on the Breach Of Good Faith Claim and the Second Part Of The Fraud Claim; and (3) dismisses the Fraudulent Transfer Claim.  An appropriate Order accompanies this Opinion.

**JOSE L. LINARES**
Chief Judge, United States District Court

Dated:  May _14th_, 2019