<u>**Not for Publication**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LEONARD EDELSON,<br><br>*Plaintiff,*<br><br>v.<br><br>STEPHEN CHEUNG,<br><br>*Defendant.* | Civil Action No. 13-5870<br>(JMV) (JAD)<br><br><u>**OPINION**</u> |

<u>**John Michael Vazquez, U.S.D.J.**</u>

This case arises out of a business relationship between Plaintiff Leonard Edelson and Defendant Steven Cheung. Two counts remain: fraud and breach of the implied covenant of good faith and fair dealing. On January 24, 2020, by way of a Consent Order, the parties consented to a bench trial. D.E. 288. The five-day trial proceeded on February 18, 19, 20, 25, and 26, 2020. In addition to numerous exhibits, the Court heard testimony from six witnesses: Edelson, Matthew "Rudy" Ranieri, Geremy Bernstein, Cheung, Betty Rodriguez, and Thomas J. Hoberman. This Opinion reflects the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### I.   PROCEDURAL HISTORY

In October 2013, Edelson brought this action against Steven Cheung; Edelson then filed a First Amended Complaint in April 2015. D.E. 1, 41. In October 2017, after Cheung apparently transferred certain assets, Edelson filed a Second Amended Complaint asserting breach of contract, breach of the covenant of good faith and fair dealing, fraud, and unjust enrichment against Steven Cheung as well as asserting fraudulent transfer against Cheung's relatives, Rosanna Cheung and

Marcus Cheung. D.E. 184. The fraudulent transfer claims against Rosanna Cheung and Marcus Cheung were settled on the record in August 2018. D.E. 232, 243.

Magistrate Judge Joseph Dickson entered numerous orders pertaining to discovery and exclusion of evidence due to Cheung's improper actions. On October 8, 2015, Judge Dickson barred persons currently residing in China or Hong Kong from providing testimony. D.E. 92. On the same date, Judge Dickson granted Edelson's motion for sanctions and barred Cheung from using six particular documents. D.E. 91. On May 25, 2016, Judge Dickson barred use of all documents Defendant produced in Mandarin. D.E. 127. Then, on January 12, 2017, Judge Dickson ruled that the trier of fact could (but was not required to) draw adverse inferences against Cheung based on his spoliation of evidence, specifically finding that Cheung had deleted relevant emails with the intent to deprive Edelson of their contents. D.E. 158 at 7-8.

On May 14, 2019, Chief Judge Jose L. Linares issued an Opinion and Order (1) granting summary judgment in favor of Cheung on the breach of contract claim, the unjust enrichment claim, and the first part of the fraud claim,[1] (2) denying summary judgment to both parties on the breach of duty of good faith and fair dealing claim and the second part of the fraud claim,[2] and (3) dismissing the fraudulent transfer claim. D.E. 254-55.

---

[1] The first part of the fraud claim was Edelson's allegation that "Cheung never told him that Cheung transferred a 10% ownership interest in [Eastchester Lace]-China to Cheung's son, and that Edelson entered into the 2006 Option Agreement with the impression that Cheung maintained 100% control." D.E. 254 at 25.

[2] The second part of the fraud claim concerns Edelson's allegation that "Cheung behaved in a fraudulent and misleading manner in order to convince him to not attempt to exercise Edelson's Option until [Eastchester Lace]-China and all of its assets had been sold or liquidated." *Id.* at 26.

## II.    FINDINGS OF FACT

Before discussing the stipulated facts and trial evidence, the Court provides a short overview of relevant events to provide proper context.  Since about 1976, Edelson has owned a New Jersey business called Westchester Lace & Textiles, Inc. ("Westchester Lace").  Westchester Lace manufactured lace, which it then sold to garment manufacturers.  In about 2003, Edelson decided to transfer his manufacturing to a new business in China due to rising costs.  The new business was called Eastchester Lace & Textiles, Ltd. ("EL-China"), and Edelson owned 50% while Cheung and two others each owned 16.67%.  EL-China was to manufacture lace for Westchester Lace to sell to its (Westchester's) customers.  In 2005, Edelson and the other two owners transferred their interests in EL-China to Cheung.  But in 2006, Cheung and Edelson entered into an option contract ("Option Agreement"), which permitted Edelson to exercise an option to again become a 50% owner of EL-China.

However, by at least 2012, Cheung and a Westchester Lace employee, Geremy Bernstein, planned to go into business together and to put Westchester Lace out of business.  There were two facets to the plan.  The first was that Cheung sold EL-China to Hang Chen on June 3, 2013.  Even though Cheung had sold EL-China to Chen, he thereafter indicated to Edelson that he (Cheung) was only thinking about selling EL-China and had not yet done so.  The sale of EL-China forms the basis of Edelson's breach of the implied covenant of good faith and fair dealing claim.  The second was that Cheung, Bernstein, and Chen established Eastchester Lace Corp. in New York ("EL-NY").  The purpose of EL-NY was to compete with Westchester Lace and, according to Edelson, take all of Westchester Lace's business.  Edelson's fraud claim is based on EL-NY as well as the sale of EL-China.

3

## A. Stipulated Facts

The following facts were stipulated to in the Final Pretrial Order ("Stipulated Facts"). D.E. 264. Beginning in 1976, Edelson owned a New Jersey business called Westchester Lace. Stipulated Facts ¶ 1. Westchester Lace manufactured lace in New Jersey and sold the lace to garment manufacturers. *Id.* Edelson later formed EL-China in Jiangmen, China in 2003 or 2004 with Cheung, Stephen Ma, and C.K. Chiu. *Id.* ¶ 2. EL-China was intended to be the manufacturer and sole supplier of lace for Westchester Lace, "for all products [EL-China] was capable of manufacturing." *Id.* ¶ 2. Edelson owned 50% of EL-China while Cheung, Ma, and Chiu each owned 16.67%. *Id.* ¶ 3.

Cheung, Ma, and Chiu formally established EL-China in China "due to their familiarity with business procedures in that country." *Id.* ¶ 4. Cheung and a relative (apparently Liso Lee) acted as the managers of EL-China. *Id.* Since Cheung, Ma, and Chiu had no expertise in the lace manufacturing business, Edelson provided EL-China with (1) expertise; (2) Westchester Lace's contacts, methods, name, and designs; (3) thirty-four lace knitting machines (plus all necessary parts and auxiliary machinery to operate the factory); (4) over 133,000 pounds of yarn; and (5) a consultant, Ranieri. *Id.* ¶ 5. Edelson paid Ranieri over $250,000 to relocate to China and set up EL-China. *Id.* Ranieri hired employees and then trained them on how to use the machinery. *Id.* EL-China sent its finished lace to Westchester Lace, which would then sell the lace to Westchester Lace's customers. *Id.* ¶ 6. Westchester Lace was to have priority in purchasing lace from EL-China. *Id.* Edelson participated in EL-China's establishment in order to create a lace-manufacturing source for Westchester Lace and maintain control in the manufacturing process. *Id.* ¶ 7.

4

In 2005, Edelson, Ma, and Chiu signed a contract conveying their interests in EL-China to Cheung. *Id.* ¶ 8. The business relationship between Westchester Lace and EL-China remained in place. *Id.* After the contract was signed, Cheung transferred 10% of his ownership interest in EL-China to one of his sons "for the alleged purpose of complying with a certain Chinese law," but failed to advise Edelson of this transfer. *Id.* ¶ 9. In September 2006, Cheung and Edelson entered into the Option Agreement, allowing Edelson to exercise an option for 50% ownership in EL-China; the Option Agreement provided as follows:

> Leonard Edelson has transferred machinery and yarn and consultant services in excess of $600,000 to [EL-China]. In as much as [Cheung] will own 100% of the shares after the company is reorganized, [Cheung] agree[s] to give 50% interest in that company or a successor company to Leonard Edelson at a date specified by him. He may exercise this option at any time.

*Id.* ¶¶ 10-11.

From 2006 through mid-2013, Cheung and his relative managed and drew salaries from EL-China. *Id.* ¶ 13. Even without an ownership interest, Edelson continued to pay Ranieri, the consultant, to assist EL-China for several years. *Id.* ¶¶ 12, 14. Westchester Lace also continued to provide EL-China with revenue by purchasing its lace. *Id.* ¶ 15.

In March 2009, Cheung told Edelson that an outside investor was interested in providing additional funding to EL-China. *Id.* ¶ 16. Edelson responded in the following email to Cheung:

> I was just thinking about this man that wants to invest ... in to [EL-China]. I have invested all the machinery ... starting yarn ... misc. parts and equipment ... [money] that I gave to ... Ma which he used for [EL-China], $250,000 in salary which I have paid to [the consultant] in order to set up and teach [EL-China]. Now he wants a board that he believes he could get to control and does not include me. Please advise if my understanding that *I am a partner* in [EL-China] is incorrect so that as I said before I can make the necessary arrangements to protect myself and Westchester [Lace].

*Id.* ¶ 16 (emphasis added). Cheung responded with the following:

5

Don't worry about what was going on with that man ... Not only you disagreed, I never agree to have him join [EL-China]. We had been suffering a lot of BS and difficulties with [EL-China] and now we all seeing the sun is rising. *You are the only partner* at [EL-China] and I am sure in a short period (1 or 2 years), we will make up what we had invested.

*Id.* ¶ 17 (emphasis added).[3]

In April 2013, "while Cheung was engaged in discussions with [Hang] Chen and without informing Edelson, Cheung established a business to sell lace and textiles named [EL-NY] that would directly compete with Westchester Lace." *Id.* ¶ 18.[4] Cheung hired an employee of Westchester Lace, Geremy Bernstein, to help EL-NY start the company's operations. *Id.* ¶ 19.

In June 2013, Cheung sent Edelson an email from Cheung's relative which discussed EL-China's alleged financial problems. *Id.* ¶ 20. In response, Edelson emailed Cheung that he wanted to meet with him to discuss these problems and the potential sale of EL-China. *Id.* ¶ 21. However, Cheung "either rebuffed these requests or indicated that he was actively in the process of seeking a buyer for EL-China." *Id.* ¶ 21. Moreover, Cheung had actually already sold EL-China to Hang Chen on June 3, 2013 without notifying Edelson. *Id.* ¶ 24.[5] On June 17, 2013, Cheung notified

---

[3] Many of the documents, particularly the emails, have grammatical and spelling errors. The Court quotes them as written except where brackets indicate otherwise.

[4] Although this fact was stipulated to before trial, Plaintiff's counsel opened the door to the issue during trial. *See* Tr. Vol. 3 at 537:21-540:14. Cheung testified that he "wasn't the one who established this company. I assisted them to establish the company." *Id.* Nevertheless, for reasons explained later on, the Court finds that Cheung was in fact a founding shareholder or member in EL-NY.

[5] Although this fact was stipulated to before trial, Plaintiff's counsel opened the door to the issue during Cheung's testimony. *See* Tr. Vol. 3 at 543:1-544:18. The Court determined the sale date of EL-NY would be for the factfinder to determine. Based upon the testimony elicited during trial; in light of Cheung's reliance on June 3, 2013 as the sale date in multiple previous filings before this Court, *see* D.E. 248, D.E. 246, D.E. 245; and in light of the Court's reliance on June 3, 2013 as the sale date in its summary judgment Opinion, D.E. 254, the Court finds that Cheung sold EL-China to Chen on June 3, 2013.

Edelson that he was meeting with a potential buyer and asked Edelson, "What price would you suggest that I ask for?" *Id.* ¶ 22. Between July 7, 2013 and July 15, 2013, Cheung emailed Edelson multiple times about meeting with potential buyers. *Id.* ¶ 23.

Moreover, as of July 25, 2013, Edelson was unaware that Cheung had hired Bernstein for EL-NY. *Id.* ¶ 25. On that date, Edelson emailed Cheung to "advise [Cheung] that [Bernstein] resigned from the company." *Id.* ¶ 25. Instead of telling Edelson that Cheung had hired Bernstein to work for EL-NY, Cheung answered, "He [Bernstein] is working with other company?" *Id.* ¶ 26. Around this time, Cheung ordered Chen to "accelerat[e] the dates that Edelson's payments for the manufactured lace were due to EL-China." *Id.* ¶ 27. Chen then reached out directly to customers of Westchester Lace "to inform them that they should direct their orders to EL-China and that EL-China would no longer accept orders through Westchester Lace." *Id.* ¶ 28.

Edelson first learned that Bernstein was working for EL-NY on August 1, 2013. *Id.* ¶ 29. Edelson contacted Cheung to tell Cheung that he was "now aware of this betrayal" and further stated: "Before I exercise that [2006 Option Agreement,] please send me [certain documents]." *Id.* ¶ 30. In an email dated August 21, 2013, Edelson acknowledged Chen was the then new owner of EL-China. *Id.* ¶ 31. However, as of August 22, 2013, Edelson was continuing to pay for Ranieri, the consultant, who was still working for Cheung and Chen. *Id.* ¶ 32.

### B. Trial Testimony

As noted, the Court heard testimony from Edelson, Ranieri, Bernstein, Cheung, Rodriguez, and Hoberman. Hoberman was Plaintiff's valuation expert.

#### 1. Leonard Edelson

Leonard Edelson testified first. Edelson is eighty-three years old and has worked in the lace manufacturing business for his entire career. Tr. Vol. 1 at 21:18-23:20. Edelson testified that

in the March 2009 email exchange between Cheung and Edelson, Cheung reassured Edelson that Edelson was "the only partner" in EL-China, which Edelson believed. *Id.* at 62:2-8; Ex. P6 (Mar. 20, 2013).

In addition, as referenced through Edelson's testimony (and formally introduced through the testimony of Cheung and Bernstein), multiple emails between Cheung and Bernstein beginning as early as 2012 evidence that Cheung, Bernstein, and Chen planned to cut off Westchester Lace from its supply of lace, EL-China; to create a competing company, EL-NY; and to hide the plan from Edelson. *See* Ex. P9 (Bernstein: "When you return we will talk about cutting off Lenny[6] and structuring the right deal between us to move forward with Eastchester.") (Apr. 5, 2012); Ex. P15 (Bernstein: "We have already started our venture.") (Apr. 18. 2013); *id.* (Bernstein: "I think we need to get going and I should quit. When are we ready? I think it's time.") (Apr. 18, 2013); Ex. P21 (Bernstein: "[W]e need to discuss how to capture everything from Lenny.") (June 28, 2013); Ex. P33 (Edelson informing Cheung that Bernstein had resigned from Westchester Lace and Cheung responding "He is working with other company?") (July 25-26, 2013). Edelson testified that if at any point he had been aware of Cheung and Bernstein's emails or plans, Edelson would have exercised his option under the Option Agreement and fired Bernstein. *See* Tr. Vol. 1 at 73:7-16, 79:17-80:23, 83:8-12. The Court finds Edelson's testimony – that he would have exercised his option and fired Bernstein – to be credible. Edelson persuasively testified that he would have exercised the option, and thereby regained 50% of EL-China, to ensure that Westchester had a reliable supply of lace. Similarly, and in accord with common sense and experience, if Edelson had known that Bernstein – a key Westchester Lace employee – was scheming against Edelson and Westchester Lace, Edelson would have fired him.

---

[6] "Lenny" refers to Plaintiff Leonard Edelson.

### 2. Matthew "Rudy" Ranieri

Matthew "Rudy" Ranieri then testified. Ranieri recounted that his career in the lace and textile industry began in 1962 and that he started working for Westchester Lace in 1990. Tr. Vol. 2 at 309:24-312:12. Ranieri's testimony focused on his experience with lace knitting machines, including setting up and operating the machines as well as the associate costs. As noted, Ranieri was the consultant paid by Edelson to get the factory in EL-China up and running, which included installing the machines and training new workers. After the initial push, Ranieri remained a consultant and regularly returned to EL-China. The Court finds that Ranieri was the most competent witness as to the knitting machines themselves. Ranieri also testified about a valuation that he prepared, at Edelson's request, of the equipment and parts in the EL-China factory as of the date it was sold, June 3, 2013. *Id.* at 324:14-334:22, 357:14-23; Ex. D25 (Dec. 8, 2013). In total, Ranieri valued the machines and equipment present in the EL-China factory as of 2013 at $1,180,000, which he testified was a conservative estimate. Tr. Vol 2. at 334:9-21. The Court finds Ranieri's testimony regarding this valuation to be credible. Ranieri gave good reasons for his valuation and also credibly explained when he erred on the side of providing a conservative amount. In addition, although subject to cross-examination, the Court finds that Cheung did not raise any persuasive points challenging Ranieri's valuation.

Furthermore, Ranieri stated multiple times during his testimony that he thinks favorably of Cheung. *See id.* at 318:4-6 ("But I have to say – I have to be honest. Personally, Mr. Cheung was a good guy for me."); *id.* at 349:18-19 ("Me and Stephen Cheung, he was good to me. I cannot say nothing against Mr. Cheung."). It is clear that Ranieri had no bias or personal motive in testifying against Cheung, further bolstering his credibility.

### 3. Geremy Bernstein

Geremy Bernstein then took the stand. Throughout his testimony, Bernstein was evasive, difficult, confrontational, and non-responsive. In general, the Court finds Bernstein's testimony – unless corroborated by independent and unassailable evidence – to not be credible. Moreover, even in the face of Bernstein's evasion, the contemporaneous evidence spoke for itself. This contemporaneous evidence consisted largely of emails between Bernstein and Cheung. For example, emails between the two clearly demonstrate that as early as 2012, Bernstein and Cheung planned to financially injure Edelson and Westchester Lace by, among other things, establishing EL-NY and taking all of Westchester Lace's customers. *See* Ex. P9; Ex. P21; Ex. P26; Ex. P30. The language that Bernstein used in emails to Cheung while Bernstein was still employed by Edelson clearly revealed their harmful intentions toward Edelson. *See* Ex. P26 (Bernstein: "Please don't put the death blow on Lenny until I close.") (July 15, 2013); Ex. P30 (Bernstein: "[Edelson] is going to be hit right between the eyes tomorrow. But you know what…..he deserves it!!! It is our time!!!") (July 23, 2013); Ex. P9 (Bernstein: "When you return we will talk about cutting off Lenny and structuring the right deal between us to move forward with Eastchester [New York].") (Apr. 5, 2012); Ex. P21 (Bernstein: "Also we need to discuss how to capture everything from Lenny.") (June 28, 2013).

### 4. Stephen Cheung

Stephen Cheung testified next. The Court finds most of Cheung's testimony to not be credible. Throughout his testimony, Cheung represented that Chen and Bernstein were the only true founders and active participants of EL-NY and that Cheung was only "helping out," acting as a go-between, and "somewhat of an outsider." *See* Tr. Vol. 3 at 507:3-17 (Cheung: "The company you mentioned, [EL-NY], was formed by two people, Hang Chen and Geremy [Bernstein]."); *id.*

at 533:6-544:7 (Cheung: "I was only helping out."); *id.* at 535:15-20 (Cheung: "I was helping him only. That's the truth. I took Hang Chen as my son. That's why I was willing to help."); *id.* at 537:1-4 (Cheung: "[M]y view is that I'm helping out and the partnership is between Hang Chen and Geremy Bernstein. I was only helping out in between."); *id.* at 571:1-11 (Cheung: "If you're talking about intention, I would say the person who intended the most is Hang Chen and Geremy Bernstein. I'm somewhat of an outsider. Yes, I did encourage them to go to get business, but, you know, I was an outsider.").

Despite Cheung's protestations to the contrary, the Court finds that Cheung was an active and critical participant with Chen and Bernstein and that the three worked together to form a competing venture, EL-NY, in an attempt to put Westchester Lace out of business. Despite Bernstein's myriad shortcomings as a witness, Bernstein unequivocally indicated during his direct examination that Cheung and Chen were his "partners" in EL-NY. *See, e.g.*, Tr. Vol. 2 at 395:18-21 (Plaintiff's counsel: "Now, your partners[7] in [EL-NY] were a gentleman by the name of Hang Chen and Stephen Cheung, were they not sir?" Bernstein: "Correct.").

Cheung's denials, and attempts to mitigate his role, are also wholly unsupported by the contemporaneous documents. In none of the email communications did Cheung ever indicate that he was working as a mere middleman or as a facilitator for Bernstein and Chen. In January 2014, Cheung wrote to Chen, Bernstein, and Liso Lee (Chen's sister-in-law): "B I N G O. THANK YOU TO ALL OF YOU. *Me and Geremy* would be the most happy persons to hear the decision. *We have to* try our best here to grab all business from [Westchester Lace]." Ex. P94 (Jan. 21,

---

[7] As to the entity, EL-NY, Cheung's counsel correctly pointed out that the word partner is not accurate because it was a corporation. The Court agrees, but also understands the use of the word partner to reflect Bernstein's view of the relationship. Bernstein was not testifying to strict corporate governance.

2014) (emphases added).  In March 2014, Cheung emailed Lee and copied Chen, Bernstein, and

an EL-China employee:

> *We have to* stop [Edelson] completely … *We have to* put him out of business and take all the business back to [EL-NY].  *Geremy and myself* will try our utmost effort to get all the business.  *We have been* busy visiting customers who still buying from [Westchester Lace].  *We have to* issue an official letter to all concerned telling them *we are not going to* take any orders from [Westchester Lace].  *We are not going to* ship any orders for [Westchester Lace].  *Geremy and I* will draft the letter tomorrow.

Ex. P108 (Mar. 6, 2014) (emphases added).

    In multiple emails, Cheung gave directions to Chen and other EL-China employees,

demonstrating that he was in fact playing a leading role, if not the leading role, in the plan against

Edelson.  *See* Ex. P35; Ex. P112.  For example, in July 2013, Cheung wrote to Chen "PLEASE

ISSUE AN INSTRUCTION TO EVERYONE AT ECL" and included the following instruction

for all EL-China staff:

> As of today, July 25, 2013, please do not send any samples, art works to [Westchester Lace] until further notice.  You should consult me, Liso, or Stephen before sending any message or answering calls to [Westchester Lace].  No one is allowed to answer questions or release information via email or phone without the management's consent.

Ex. P35 (July 27, 2013).  While Cheung testified that this email was "at [Bernstein's] suggestion,"

there is no evidence substantiating this assertion.  In fact, Cheung did not even copy Bernstein on

the email.  *See* Tr. Vol. 3 at 580:16-20; Ex. P35.  Similarly, in March 2014, Cheung emailed Chen

and Lee and copied Bernstein, instructing Chen to send another announcement (that Cheung

himself had drafted) to Westchester Lace's biggest customers informing them that EL-NY would

no longer accept orders from Westchester Lace.  Ex. P112 (Mar. 11, 2014); Tr. Vol. 3 at 574:18-

575:15.  In yet another email dated July 26, 2013, Cheung directed employees of EL-China to not

12

fill Edelson's order for Maidenform and to "[s]end everything to me when done. Do not send anything to [Westchester Lace]. Send me an email to make sure you all understand this issue." Ex. P34 (July 26, 2013). Besides Maidenform, Cheung also took action as to another Westchester Lace customer, Komar. Cheung directed employees of EL-China not to send any Komar orders to Westchester Lace, instructing employees to "[c]ontact me or [Bernstein] before doing anything." Ex. P73 (Oct. 4, 2014). It is clear from these emails that Cheung was operating from a position of authority within EL-NY.

In addition, Cheung held himself out as a leader of EL-NY to customers and the public. Cheung admitted that he had business cards identifying him as the president of EL-NY and that he indeed held himself out to customers (including Komar) as the president. Tr. Vol. 3 at 605:11-606:3. Additionally, on May 15, 2015, Cheung sent an email to a customer that said "I want you to meet with *my partner* [Bernstein]. [Bernstein], please arrange a date and time to meet in *our office*." Ex. P147 (emphases added). Both Cheung and his wife also had authority to write checks on behalf of EL-NY, and, as exhibit P89 demonstrated, Cheung even wrote out a number of EL-NY checks to himself. *See* Tr. Vol. 3 at 607:17-609:20; Ex. P89. Lastly, Cheung's capital contribution of $25,000 into EL-NY provides further evidence of his role in the company. *See* Ex. P84 (Cheung: "I also put in 25,000 into ECL New York[.]") (Mar. 11, 2013). For all of the foregoing reasons and based on this plethora of evidence, the Court finds that Cheung was, at a minimum, an equal member of EL-NY alongside Chen and Bernstein; Cheung was not a go-between or outsider.

Cheung also sold EL-China to Chen on June 3, 2013, yet concealed that critical fact from Edelson both before and after the sale. One day before the sale, Cheung emailed Edelson the following about the future of EL-China:

> At this time, it is also shaking my confidence of keeping the hot ball.
> I really wanted my investment back especially the outstanding loan
> from Bank of China. We are unable to pay back the loan even after
> ten years. Now that government is chasing for taxes due from all
> foreign owned companies; It makes me feel very depressed. [EL-
> China] is running only 10 machines for months and we do not fore
> see [sic] any potential orders in the future. Looks like [EL-China]
> has no hope at all.

Ex. D9. Critically, Cheung did not disclose to Edelson in the email that he was finalizing the sale

of EL-China the very next day. During trial, Cheung admitted that he did not tell Edelson about

selling EL-China to Chen prior to the sale. S*ee* Tr. Vol. 4 at 651:16-20. Cheung said he did not

need to inform Edelson of EL-China business decisions because "that was my company." Tr. Vol.

4 at 657:25-658:2, 654:1-13. However, when EL-China needed funding, Cheung reached out to

Edelson. *See, e.g.*, *id.* at 701:16-23 (Defendant's counsel: "Would you ever approach Mr. Edelson

and ask him for money to purchase lace yarn?" Cheung: "Yes. Actually, all of us, including

myself, the office in Hong Kong, and office in China all make the request to him.").

Furthermore, after selling EL-China, Cheung repeatedly indicated to Edelson that he

(Cheung) was in the process of selling EL-China and had not yet done so. *See* Ex. P27 (Cheung:

"I am unable to come this morning to see you. Planned to go to Hong Kong tomorrow morning

trying to finalize the deal with buyer. Will keep you posted for any new development.") (June 15,

2013); Ex. P19 (Cheung: "Just to inform you that I am leaving in the morning for China as I have

received a call from China that one of the person is interested in purchasing [EL-China]. I am

going to sell it as I have so much debts that I have to pay and the business is really not worthy of

continuing. What price would you suggest that I should ask for?") (June 17, 2013). Even as late

as July 2013, Cheung pretended he had not yet sold EL-China and told Edelson the following:

> Came back from China a few days ago; Did not contact you during
> the July 4 holidays because I was quite busy with Rosanna – the
> Church business. Met two potential buyers in China who are in the

14

textile field. Nothing had been confirmed yet because we did not
come to a mutual agreement to satisfy both parties.

Ex. P27. When Edelson attempted to meet with Cheung after June 3, 2013, Cheung was evasive.

*See* Ex. P16 ("Cheung: Unable to see you these days as I can't even talk.") (June 4, 2014).

Cheung's testimony regarding the financial aspects of EL-China's sale was inconsistent and largely unreliable. While Cheung informed Edelson the day before the sale that EL-China was in dire financial straits, Cheung did not produce any financial records to support this claim. *See* Ex. D9 (Cheung telling Edelson that EL-China has "no hope at all" and that Cheung felt "very depressed") (June 2, 2013). In fact, Cheung admitted that he was *not* familiar with the EL-China's finances, as he had never personally inspected EL-China's books or financial records. Tr. Vol. 3 at 502:8-14; Tr. Vol. 4 at 708:23-709:12.

Cheung also testified that he sold EL-China for $100,000, Tr. Vol. 4 at 655:5-13, but did not offer any evidence to corroborate this testimony. Westchester Lace's bookkeeper, Rodriguez, testified credibly that as of June 3, 2013, Westchester Lace owed EL-China a total of $347,799.45. Tr. Vol. 4 at 748:25-750:11. Cheung did not deny having the receivable or explain why he purportedly sold EL-China for $100,000 when it was owed at least $347,000. In fact, in the only EL-China record produced that speaks to the financial condition of the company, Ex. P103, Cheung represented that the factory's sales for 2012-13 totaled over five million dollars. Even if the Court accepts Cheung's testimony that the financial condition of EL-China was poor in 2005, *see* Tr. Vol. 4 at 682:17-19, it does not prove that EL-China was in the same precarious financial position nearly a decade later.

In addition, Cheung's actions in 2013 and 2014 were inconsistent with his claim that EL-China was facing a financial crisis. Cheung, Chen, and Bernstein created EL-NY in 2013 to compete directly with Westchester Lace. EL-NY's source of lace supply was EL-China. To

15

compete with (or as the emails suggest, eviscerate) Westchester Lace, EL-NY's prices could not have been higher than those of Westchester Lace's. Yet, Cheung clearly believed that EL-China remained financially viable to source EL-NY; supply from EL-China was critical to EL-NY's success. The fact that Cheung established EL-NY in reliance on EL-China's manufacturing before selling EL-China renders Cheung's claim as to EL-China's financial status incredible.

Additionally, the fact that Cheung remained closely involved with EL-China after the sale also conflicted with Cheung's testimony that the company had "no hope." On the one hand, Cheung testified that as a condition of Chen's purchase of EL-China, Chen required Cheung to "stay in the company to help [Chen] for a number of years." Tr. Vol. 4 at 657:13-18. On the other hand, Cheung claimed that at the time he sold EL-China to Chen, he knew little to nothing about the lace business and the company had "no hope." *See id.* at 648:28-649:10 (Cheung: "I do not really know the steps in this business, the process, how to engage it ... I do not know the pricing in this line of business."); Ex. D9.

While hiding the sale of EL-China from Edelson, Cheung also established EL-NY to complete with Westchester Lace. Cheung testified that in collaborating with Bernstein and Chen, he had no intention to harm Edelson or put Westchester Lace out of business. *See* Tr. Vol. 3 at 567:21-568:1 (Cheung: "I did not have intention to grab this business, but if [Chen] designated me to meet with clients, I went."); Tr. Vol. 4 at 703:21-704:2 (Cheung: "[W]e did not have intention to create a company to destroy him, no."). However, emails sent by Cheung clearly contradict his testimony. *See* Ex. P108 (Cheung: "We have to stop [Edelson] completely ... He is a Monster. We have to put him out of business and take all the business back to [EL-NY]. Geremy and myself will try our utmost effort to get all the business.") (Mar. 6, 2014); Ex. P94 (Cheung: "We have to try our best here to grab all business from [Westchester Lace].") (Jan. 21, 2014). Additionally,

Cheung admitted to not telling Edelson about the formation of EL-NY, *see* Tr. Vol. 3 at 509:2-7, which sheds light on Cheung's credibility and intentions.

There are additional reasons why Cheung was not credible. Cheung was materially inconsistent regarding his awareness and understanding of the Option Agreement. Cheung first testified that he considered the Option Agreement a "trap," Tr. Vol. 4 at 651:21-24, but subsequently testified that he "was not aware" of the Option Agreement when he was negotiating with Chen, *id.* at 653:14-19. Cheung also testified that he had no understanding of why Edelson wanted an option to get 50% ownership in EL-China back, *id.* at 688:23-689:3, which the Court deems incredible. Cheung also was inconsistent as to his memory. When answering questions during direct examination that benefitted him, Cheung answered clearly. But when asked questions by opposing counsel that would have yielded unfavorable answers, Cheung repeatedly stated that he could not remember and/or cited memory issues resulting from brain surgery. *See* Tr. Vol. 3 at 511:7-11; *id.* at 573:18-574:5; *id.* at 605:24-606:3. For example, when asked by Plaintiff's counsel if Cheung wanted to "go after" Westchester Lace's customers (as Cheung had written in exhibit P108), Cheung claimed that was Bernstein's plan and said that he only wanted to pay back money loaned to him from his mother-in-law and Liso Lee, adding that "my health has been in decline at that point, and I cannot think of anything – anything – you know, use of the brain too much. I have constant headaches." *Id.* at 724:12-21. Notably, Cheung presented no medical records or expert testimony regarding his surgery or memory. And, as indicated, Cheung's memory was intact on topics that appeared to benefit him.

### 5. Beatrice Rodriguez

Beatrice Rodriguez, a Westchester Lace employee for seventeen years, testified after Cheung. Tr. Vol. 4 at 730:11-13. Her responsibilities involve finances, bookkeeping, and sales.

17

*Id.* at 730:14-731:1.  Using the year 2013 as a baseline, Rodriguez calculated Westchester Lace's

lost profits for the period 2014 through 2018 as $1,384,721.52.  *Id.* at 732:8-15.  She also testified

that Komar, one of Westchester Lace's major customers, stopped doing business with Westchester

Lace entirely in 2014.  *Id.* at 735:5-9.  While Rodriguez noted a significant decline in sales

beginning in 2014, *id.* at 735:2-13, she did not testify as to what percentage or amount of lost sales

was attributable to losing Komar as a customer.  In fact, Rodriguez did not attribute any specific

loss to any particular customer; instead, she testified that all losses were due to EL-NY.

### 6.  Thomas J. Hoberman

Thomas J. Hoberman, Plaintiff's expert witness, was the final person to testify.  Hoberman

is the partner in charge of forensic evaluation services at WithumSmith+Brown, a full-service

audit, tax, and advisory firm.  Tr. Vol. 5 at 768:3-14.  Hoberman has a degree in accounting and

also holds certifications in public accounting, accredited and business valuation, and financial

forensics.  *Id.* at 769:3-21.  He is a member of multiple professional organizations in his field.  *Id.*

at 769:3-21.  Hoberman began his forensic and valuation career in the early 1990s and has taught

both business valuation and forensic accounting to various CPA organizations and bar

associations.  *Id.* at 770:3-12.  He has been previously qualified as a valuation expert in multiple

states.  *Id.* at 771:1-7.  The Court qualified Hoberman as an expert in business valuation and credits

his valuation of a 50% interest in EL-China, the amount of Edelson's interest under the Option

Agreement.

Hoberman's opined that the fair value of Edelson's 50% interest in EL-China as of June 3,

2013 was $2,293,000.  *Id.* at 775:9-11.  In explaining his methodology, Hoberman testified that

there are three different valuation approaches: the income approach, the asset approach, and the

market approach.  *Id.* at 775:15-20.  Hoberman used the market approach, considered the asset

approach, and was precluded from using the income approach due to the lack of financial statements or tax returns. *Id.* at 776:21-24, 778:21-779:9.

Employing the market approach, Hoberman identified nineteen publicly traded and privately held companies in the same or similar line of business to EL-China, specifically manufacturing and textile companies, using a database in the valuation industry called Capital IQ. *Id.* at 776:21-778:1. He then identified various market multiples that he applied to data he had been provided about EL-China. *Id.* Among the documents Hoberman considered were the deposition testimonies of Cheung, Edelson, and Ranieri; Ranieri's 2013 appraisal of EL-China (Ex. D25); general ledgers from Westchester Lace (including the purchases that Westchester Lace made from EL-China); machine efficiency reports provided to Westchester Lace by EL-China; the questionnaire Frontier[8] completed for Maidenform and Cheung's questionnaire responses (Ex. P103); and various publications related to the industry. *Id.* at 772:1-13, 780:18-785:12. Ultimately, Hoberman arrived at a business enterprise value for EL-China of $4,586,000 under the market approach. *Id.* at 778:2-6.

Hoberman also considered the asset approach, which is "essentially the floor value of the company," by relying on Ranieri's $1,180,000 appraisal of the equipment owned by EL-China in 2013. *Id.* at 779:7-22. Hoberman explained that "if you were going to liquidate, sell the assets, pay off any liabilities that were existing, this is what the shareholders would walk away with." *Id.* at 779:23-25. However, Hoberman noted that intangible assets like customer lists and supply chains "help drive cash flow that results in a value that's higher than a net asset value." *Id.* at

---

[8] Frontier was a Hong Kong entity related to EL-China that collected payments for EL-China's sales. Tr. Vol. 4 at 713:20-714:7; 744:3-11. There was testimony that Frontier and EL-China were effectively one and the same. Tr. Vol. 5 at 781:20-782:3, Tr. Vol. 1 at 63:24-64:7. Cheung testified that in the "same period of time" that EL-China was sold to Chen, Frontier was also sold to Chen. Tr. Vol. 4 at 655:14-23.

780:1-5. Therefore, given the asset approach's limits and an inability to use the income approach, Hoberman determined that the market approach was the most accurate. *Id.* at 780:6-9. The Court finds Hoberman's methodology and analysis to be reliable.

### III.   CONCLUSIONS OF LAW

#### A.   Applicable Law

When a Court has diversity jurisdiction, as is the case here, the court applies the choice-of-law rules of the forum state to determine controlling law, here New Jersey. *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013). Neither party contests that New Jersey's choice of law rules result in the application of New Jersey substantive law, which the Court applies.

#### B.   Implied Covenant of Good Faith and Fair Dealing

The SAC asserts a claim for the breach of the covenant of good faith and fair dealing. D.E. 184 ¶¶ 253-259. Chief Judge Linares previously found in his summary judgment Opinion that the Option Agreement between Cheung and Edelson is a contract. D.E. 254. Under New Jersey law, "[e]very party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 224 (N.J. 2005). "The party claiming a breach of the covenant of good faith and fair dealing must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Id.* at 225 (quotation omitted). The New Jersey Supreme Court has cautioned that it "cannot catalogue the myriad forms of conduct that may constitute a violation of the covenant of good faith and fair dealing ... [because e]ach case is fact-sensitive." *Id.* at 225. Plaintiff has the burden to prove his claim by a preponderance of the evidence.

20

"A defendant may be liable for a breach of the covenant of good faith and fair dealing even if it does not 'violat[e] an express term of a contract.'" *Id.* at 226 (internal citation omitted). A plaintiff may succeed on such a claim if "it relies to its detriment on a defendant's intentionally misleading assertions." *Irwin Katz & Assocs., Inc. v. Concepts in Health, Inc.*, No. 13-1217, 2014 WL 6471486, at *9 (D.N.J. Nov. 19, 2014) (internal citation omitted). Similarly, a defendant can be held to have violated the implied covenant if he "withheld vital information from plaintiff with the purpose of exploiting the terms of the contract without regard to the harm caused to plaintiff." *Id.* at *10. In any event, "proof of 'bad motive or intention' is vital to an action for breach of the covenant." *Id.* at *9. (internal citations omitted).

Plaintiff has proven, by a preponderance of the evidence, a breach of the covenant of good faith and fair dealing by Cheung as to the Option Contract. Among other evidence, the email exchanges both before and after[9] July 3, 2013 demonstrate that Cheung acted in bad faith and

---

[9] Defendant took the position during closing that as to this claim, the Court should only consider conduct and representations before EL-China was sold on July 3, 2013. Tr. Vol. 5 at 840:10-17. Defendant argued that anything that happened after EL-China was sold is "irrelevant" because "it couldn't have possibly been evidence of a breach of covenant because the covenant didn't exist." *Id.* However, the Court finds that Cheung's conduct and representations after July 3, 2013 are relevant as to whether Cheung acted with bad faith. In other words, Cheung's actions and statements after the sale are relevant to his state of mind before the sale. "[E]vidence of bad motive may be established through circumstantial evidence" because "one's state of mind is seldom capable of direct proof and ordinarily must be inferred from the circumstances properly presented and capable of being considered by the court." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 254 (2001) (internal citation omitted). In proving bad faith, "[w]hat a person's intentions were need not be proved from what he said, but they may be inferred from *all* that he did and said, and from *all* the surrounding circumstances of the situation under investigation." *Id.* (emphases added). Therefore, the Court considers Cheung's conduct and representations both before and after June 3, 2013 in assessing the good faith and fair dealing claim. Specifically, Cheung's misrepresentations after the sale are relevant to whether he acted with bad faith. To use a sports analogy, an observer can consider an actual football play as evidence of which play was called in the huddle.

engaged in conduct that denied Edelson the benefit of the bargain originally intended by the parties under the Option Agreement.

Before and after Cheung sold EL-China to Chen, Cheung "withheld vital information from [Edelson] with the purpose of exploiting the terms of the [Option Agreement] without regard to the harm caused to [Edelson]." *Irwin Katz & Assocs.*, No. 13-1217, 2014 WL 6471486, at *9. It is undisputed that EL-China was Westchester Lace's primary supplier of lace and that Cheung knew this. Thus, given the circumstances of this case, Cheung's sale of EL-China to Chen without notifying Edelson (so that he could exercise his option and retain 50% of EL-China) constituted a breach of the implied covenant of good faith and fair dealing.[10] Before selling EL-China, Cheung concealed from Edelson that he and Bernstein were working together to start a competing venture, EL-NY, all while Bernstein was still employed by Edelson. *See* Tr. Vol. 3 at 509:3-6 (Cheung explaining he did not inform Edelson about the establishment of EL-NY to directly compete because "[t]hat company did not belong to him. Why should I inform him?"). When Bernstein quit Westchester Lace to work for EL-NY, Cheung feigned ignorance and concealed from Edelson that he and Bernstein were working together and had been for some time. *See* Ex. P33 (July 25-26, 2013). Cheung also concealed from Edelson that he was selling EL-China to Chen. *See* Tr. Vol. 4 at 651:16-20. Similarly, as is discussed below as to the fraud claim, Cheung also made affirmative misrepresentations to Edelson on June 2, 2013, the day before Cheung sold EL-China. *See* Ex. D9.

---

[10] During trial, Cheung's counsel made the point that the Option Agreement did not expressly require Cheung to notify Edelson before the sale of EL-China. This is an accurate statement, but it misses the mark. If the Option Agreement had contained such an express provision, then the proper cause of action would have been breach of contract (on which Cheung won summary judgment) rather than the implied covenant of good faith and fair dealing.

The plans (to sell EL-China and start EL-NY) that Cheung concealed from Edelson were clearly intended to cause serious harm to Edelson. *See* Ex. P30 (Bernstein: "He is going to be hit right between the eyes tomorrow. But you know what…..he deserves it!!! It is our time!!!" Cheung: "Yes … He deserved it.") (July 23-24, 2013); Ex. P108 (Cheung: "We have to stop him completely … He is a Monster. We have to put him out of business and take all the business back to [EL-NY]. Geremy and myself will try out utmost effort to get all the business.") (Mar. 6, 2014); Ex. P94 (Cheung: "We have to try our best here to grab all business from [Westchester Lace].") (Jan. 21, 2014); Ex. P9 (Bernstein: "When you return we will talk about cutting off Lenny and structuring the right deal between us to move forward with Eastchester.") (Apr. 5, 2012); Ex. P21 (Bernstein: "[W]e need to discuss how to capture everything from Lenny.") (June 28, 2013); Ex. P26 (Bernstein: "Please don't put the death blow on Lenny until I close") (July 15, 2013). The Court finds that Cheung withheld this vital information to exploit the terms of the Option Agreement and deny Edelson a 50% stake in EL-China. Not only did Cheung do so *without regard* to the harm caused to Edelson, Cheung did so with a clear intent to financially harm Edelson.

Cheung's actions after the sale date, including Cheung's EL-NY campaign to "grab all business" from Westchester Lace, clearly show Cheung's ill intent and bad faith toward Edelson. *See* Ex. P94 (Jan. 21, 2014). *See also* Ex. P108 (Cheung: "We have to stop him completely … He is a Monster. We have to put him out of business and take all the business back to [EL-NY]. Geremy and myself will try our utmost effort to get all the business.") (Mar. 6, 2014); Ex. P112 (Cheung drafting an email to Westchester Lace's biggest customers stating EL-NY would no longer accept orders from Westchester Lace) (Mar. 11, 2014); Ex. P34 (Cheung directing employees of EL-China to not fill Maidenform orders for Westchester Lace) (July 26, 2013); Ex P73 (Oct. 4, 2014) (Cheung directing employees of EL-China to not send any Komar orders to

Westchester Lace).  Similarly, Cheung's misleading statements after the sale date indicating that he was still looking at potential buyers support a finding that Cheung acted with a bad intent before the sale.  *See* Ex. P27 (Cheung: "Planned to go to Hong Kong tomorrow morning trying to finalize the deal with buyer.") (June 15, 2013); Ex. P19 (Cheung: "I am leaving in the morning for China as I have received a call from China that one of the person is interested in purchasing [EL-China].") (June 17, 2013); Ex. P27 (Cheung: "Met two potential buyers in China who are in the textile field. Nothing had been confirmed yet[.]") (July 2013).  In other words, Cheung's subterfuge after the sale reflects on his intent before the sale.

Cheung pointed to exhibit D16, an August 1, 2013 email from Edelson to Cheung, to argue that Edelson had not established a breach of the covenant of good faith and fair dealing.  In the email, Edelson indicated that he had learned about Cheung's scheme and had been advised to exercise the Option Agreement, but requested financial statements and other documents from Cheung before exercising the option.  Ex. D16.  In closing, Cheung argued that his actions "did not in any way destroy or compromise [Edelson's] ability to exercise the option," but that, instead, Edelson chose not to exercise the option because he "wanted to make sure the company was worth acquiring an ownership interest in."  Tr. Vol. 5 at 848:10-852:2.  The Court, however, finds that Edelson's request to see EL-China's books and records before exercising his option merely established that Edelson was a prudent businessperson.

Additionally, the Court draws a negative inference against Cheung based on his spoliation of evidence, as per Judge Dickson's Opinion.  D.E.  158.  As Judge Dickson's Opinion indicates, Cheung admitted during his deposition that he had an additional email address, Stephen.eclny@gmail.com, that he had not previously disclosed and from which he had deleted emails.  *Id.* at 2-3.  This email account was unknown to Edelson and was used by Cheung to

24

communicate with Bernstein about their scheme to establish a competing venture and put Westchester Lace out of business. *See id.*; Tr. Vol. 4 at 612:8-614:3. Judge Dickson found that Cheung's conduct "was intended to deprive Plaintiff of the information contained in the e-mails in question" and held that the finder of fact could "presume the information was unfavorable to Defendant." D.E. 158 at 7. This Court draws the adverse inference that the emails deleted by Cheung contained further evidence of Cheung's ill intent and bad faith.

For the foregoing reasons, Edelson has provided by a preponderance of the evidence Cheung's breach of the implied covenant of good faith and fair dealing.

### C. Fraud

The SAC also alleges fraud. D.E. 184 ¶¶ 260-277. Specifically, Edelson alleges that "Cheung behaved in a fraudulent and misleading manner in order to convince [Edelson] to not attempt to exercise Edelson's Option until EL-China and all of its assets had been sold or liquidated." D.E. 254 at 26. Under New Jersey law, to prevail on a claim for common law fraud, a plaintiff must prove each of the following: (1) a material misrepresentation of fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon; and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997). "Where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'" *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993) (internal citations omitted). The following three categories of relationships give rise to a duty to disclose:

> (1) Fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3)

> relationships involving transactions so intrinsically fiduciary
> that a degree of trust and confidence is required to protect the
> parties.

*Id.* (citing *Berman v. Gurwicz*, 189 N.J. Super. 89, 458 A.2d 1311, 1313 (Ch. Div. 1981). Plaintiff

has the burden to prove his fraud claim by clear and convincing evidence. *Lithuanian Commerce*

*Corp. Ltd. v. Sara Lee Hosiery*, 214 F. Supp. 2d 453, 454 (D.N.J. 2002).

The June 2, 2013 email from Cheung to Edelson (exhibit D9) – written one day before

Cheung's sale to Chen was finalized – is strong proof of fraud.  Cheung made multiple material

misrepresentations of fact within the email, writing:

> At this time, it is also shaking my confidence of keeping the hot ball.
> I really wanted my investment back especially the outstanding loan
> from Bank of China.  We are unable to pay back the loan even after
> ten years … [EL-China] is running only 10 machines for months and
> *we do not fore see [sic] any potential orders in the future.  Looks*
> *like [EL-China] has no hope at all.*

Ex. D9 (emphasis added).  Cheung made a material representation when he claimed that there was

presently no hope for EL-China because, in fact, he was scheduled to sell EL-China the very next

day (and in fact did so) and because he had already established EL-NY several months before.

EL-NY planned to use EL-China to meet EL-NY's lace needs.  Cheung (along with Bernstein)

also planned to use EL-NY to usurp Westchester Lace's customers.  For similar reasons, Cheung's

claim that that EL-China did not foresee any potential orders in the future was a material

misstatement.  In fact, just the opposite was true – Cheung was anticipating a large number of

orders for EL-China vis-à-vis EL-NY.  The evidence presented clearly proves (1) the falsity of the

statements and (2) that Cheung knew of the falsity of the statements at the time he made them.

The fact that Cheung had already established EL-NY as of April 2013, Stipulated Fact ¶ 18, and

that EL-China went on to continue manufacturing – in support of a competing venture, EL-NY –

further proves Cheung's bad faith and knowledge of the falsity of his statements.  In fact, despite

his contrary trial testimony, Cheung was hoping to profit from EL-NY (and at the expense of Westchester Lace).[11]

During trial, Edelson was asked the following:

> [H]ad Stephen Cheung wrote to you [on June 2, 2013] in D9, all right, and disclosed to you that not only was he was going to close on and consummate the sale of [EL-China] the following day, but that he was going to sell it to an individual who was going to compete directly against you, would you have exercised your option to take a 50 percent interest in the company, sir?

Tr. Vol. 2 at 295:13-20. Edelson answered that he "of course" would have exercised his option. *Id.* Cheung misled Edelson as to the pending sale to Chen and also as to EL-China's anticipated lace orders. As a result, in reasonable reliance thereon Edelson did not exercise his rights under the Option Agreement on June 2, 2013. The Court finds Edelson's testimony credible in this regard – he would have exercised his option had he known that not only was EL-China being sold, it was being sold to supply a direct competitor of Westchester Lace. Cheung's claim of "no hope" for EL-China was materially false. The resulting damage was the loss of Edelson's 50% ownership interest option in EL-China, which Edelson lost the following day on June 3, 2013 when Cheung sold EL-China to Chen. Therefore, the Court finds that Edelson has proven his fraud claim by clear and convincing evidence. The Court also draws a negative inference against Cheung based

---

[11] As to the loan mentioned in the June 2, 2013 email, Cheung testified in his deposition and during trial that EL-China had no such loans, which is proof of another material misrepresentation. Tr. Vol. 4 at 720:5-21, 683:6-20. However, Edelson's testimony as to his reliance on this information was not clear. As a result, the Court does not find the misstatements as to the loans as a basis for fraud.

on his spoliation of evidence, as per Judge Dickson's Opinion. D.E. 158. The adverse inference is that the emails deleted by Cheung contained further evidence of Cheung's intent to defraud.[12]

Edelson also argues that he was defrauded by Cheung's material omissions that Cheung had a duty to disclose based on Edelson and Cheung's "special relationship." The Court disagrees. Edelson and Cheung did not share a "special relationship" under any of the three *Lightning Lube* categories. *Lightning Lube*, 4 F.3d at 1185. As to the first category, the two did not share a traditional fiduciary relationship, such as principal and agent, client and attorney, or beneficiary and trustee. The Court further finds that the other two categories defining a special relationship are not met.

Edelson's asserts that he had the requisite special relationship with Cheung because they were partners. It is true that Cheung told Edelson in a March 20, 2009 email "You are the only partner at ECL[.]" Ex. P6. But the two did not in fact enter into a partnership as defined by N.J.S. 42:1A-10 or any of its predecessor statutes, such as N.J.S. 42:1-7 *et seq*. Edelson conveyed his ownership interest in EL-China to Cheung in 2005. Stipulated Facts ¶ 8. At the time of the Option Agreement in 2006, Edelson had no interest in EL-China; indeed, the entire purpose of the Option Agreement was to permit Edelson to obtain an interest – if he so chose – at some indefinite point in the future. Not only was Edelson not an owner of EL-China and Cheung was not an owner of Westchester Lace, no other facets of a partnership were present, such as the sharing of profits and losses.

Cheung and Edelson were also not in a relationship in which "one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied." *Id*. Under

---

[12] Since the misstatements in Cheung's deleted emails were not made to Edelson, the adverse inference cannot and is not being used to prove fraud. Rather, the adverse inference is being used to prove Cheung's intent to defraud.

New Jersey law, a duty to disclose should only be imposed under this category where "the advantage taken of the plaintiff's ignorance is 'so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling[.]'" *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 554 (App. Div. 1997) (quoting Restatement (Second) of Torts § 551(2) cmt. 1 (1977 & Supp. 1997). Edelson's decades of experience in the lace manufacturing business evidence that Edelson was not an "ignorant" party. For example, besides the Option Agreement, Edelson could have caused Westchester Lace to enter into a written and definitive supply agreement with EL-China. For these reasons, Cheung's actions toward Edelson were not "so shocking to the ethical sense of the community" or "so extreme and unfair, as to amount to a form of swindling[.]" *Kensey*, 306 N.J. Super. at 554. Edelson was an experienced and sophisticate businessperson who, unfortunately, trusted Cheung; but Edelson also had other means to protect himself from Cheung's bad acts. Moreover, the business transactions between the two parties regarding lace manufacturing were not "so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." *Lightning Lube*, 4 F.3d at 1185. While Edelson has correctly cited the legal standards in this area, he has not presented any authority in which a special relationship was found under analogous circumstances. The Court declines to do so.

### D. Damages

#### 1. Compensatory Damages

Edelson is seeking the value of his 50% interest in EL-China at the time it was sold in June 2013 as well as lost profits from 2013 through 2018. Tr. Vol. 5 at 823:6-824:11. "Compensatory damages are designed 'to put the injured party in as good a position as he would have had if performance had been rendered as promised.'" *Donovan v. Bachstadt*, 91 N.J. 434, 445, 453 (1982) (internal citations omitted). In order to obtain compensatory damages, the non-

breaching party must demonstrate that the loss is a "reasonably certain consequence of the breach." *Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C.*, 191 N.J. 1, 14 (2007) (citing *Donovan*, 91 N.J. at 445). New Jersey courts have long held that "[p]roof of damages need not be done with exactitude … It is therefore sufficient that the plaintiff prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate." *Id.* (internal citations omitted). A plaintiff may also recover lost profits for a breach of the implied covenant of good faith and fair dealing. *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 425 (1997).

For fraud claims, the basic objective of damages is to make an injured party whole. *Correa v. Maggiore*, 196 N.J. Super. 273, 285 (App. Div. 1984). "In general, a damage award for fraud should compensate the plaintiff for every injury which is the natural and proximate result of the fraud." *Shulton, Inc. v. Optel Corp.*, 698 F. Supp. 61, 64 (D.N.J. 1988) (citing *Zeliff v. Sabatino*, 15 N.J. 70, 73 (1954)). The New Jersey Supreme Court has held that the measurement of damages in fraud actions should be flexible. *Zeliff*, 15 N.J. at 75. "Courts in New Jersey generally follow the expectation or benefit of the bargain theory to measure damages in an action for money damages for fraud." *Shulton*, 698 F. Supp. at 63. A plaintiff may be entitled to recover for lost profits under a fraud claim. *Vibra-Tech Engineers, Inc. v. Kavalek*, 849 F. Supp. 2d 462, 496 (D.N.J. 2012). "Lost profits are the difference between the lost gross income and the costs or expenses which would have been expended to produce the income." *Id.* at 497.

Edelson has successfully proven compensatory damages on both the breach of the implied covenant of good faith and fair dealing claim and the fraud claim in the amount of 50% of EL-China's value at the time it was sold. As to both claims, Edelson clearly demonstrated that the

loss of Edelson's opportunity to exercise the Option Agreement was a reasonably certain consequence of Cheung's breach and fraud. *See Totaro*, 191 N.J. at 14 (internal citation omitted).

The parties dispute the value of Edelson's 50% interest. Edelson claims that the value of his interest in EL-China as of July 3, 2013 is $2,293,000, which is the amount put forward by Edelson's valuation expert Hoberman. Tr. Vol. 5 at 823:6-13. In turn, Cheung claims that the value of the company at the time it was sold is $100,000 – the amount Cheung sold it for – making Edelson's 50% interest worth $50,000. Tr. Vol. 5 at 866:23-867:3. As previously noted, the Court finds Hoberman's methodology and valuation to be credible. The Court notes that Cheung provided no documentation or corroboration in support of a valuation of $100,000. In addition, Cheung made clear during trial that he had never personally inspected EL-China's books and financial records. Tr. Vol. 3 at 502:8-14; Tr. Vol. 4 at 708:23-709:12. Therefore, the Court finds no support for Cheung's $100,000 valuation of EL-China (save Cheung's uncorroborated testimony) and values Edelson's 50% interest in EL-China at $2,293,000.

Edelson also seeks damages in the form of lost sales and profits of Westchester Lace from 2014 through 2019 in the total amount of $1,384,721. Tr. Vol. 5 at 824:12-17. The Court finds that while Edelson has shown that he more likely than not lost sales and profits as a result of Cheung's breach and fraudulent conduct, Edelson has not sufficiently provided the Court with a reasonable damage amount. As to lost profits, Edelson took an all or nothing approach, attributing all losses to Cheung. Rodriguez calculated lost profits by using 2013 sales as a "baseline," subtracting each subsequent sales year from 2013, and then multiplying a calculated profit margin of 25.9% to the lost sales figure. Tr. Vol. 4 at 734:21-735:1, 739:15-740:13; Ex. P162A; Ex. P162B. The Court has several concerns with Rodriguez's methodology. First, as to the baseline, Rodriguez chose the year of default, 2013. While this selection has some basic appeal, it fails to

31

account for wide fluctuations in Westchester's Lace's sales in the years leading up to 2013. These fluctuations needed to be accounted for and reasonably explained before accepting 2013 as a baseline. Moreover, as to the alleged lost profits, when Cheung's counsel asked Rodriguez "[i]sn't it true that there could have been a multitude of reasons why there were lost profits at that time," Rodriguez answered only that the lost profits were caused by the sale of EL-China and competition by EL-NY. Tr. Vol. 4 at 753:20-754:15. In other words, Rodriguez did not consider the market or any other factors that could have affected Westchester Lace's sales or profits from 2014 to 2019. At a minimum, Rodriguez needed to provide some reasonable explanation as to why other potential causes were not actually factors. Further, while Edelson testified credibly that Komar stopped doing business with Westchester Lace entirely as a result of Cheung's actions, Edelson did not set forth a reasonable amount of lost profits attributable to the loss of Komar's business. Tr. Vol. 1 at 103:14-17. In other words, Edelson did not attempt to show how much profit Westchester Lace lost due to Komar specifically. Finally, while Edelson's theory is that all of Westchester Lace's profits were attributable to EL-NY, the only evidence in the record is that EL-NY was in business for a short period of time. Tr. Vol. 2 at 468:16-22. The Court admittedly views such evidence with a jaundiced eye because it stemmed from Bernstein and Cheung, but Edelson never introduced any evidence to the contrary. Assuming EL-NY's short-lived existence, Edelson has not shown – in any reasonably definable amount – that all his lost profit went from Westchester Lace to EL-NY.

While Edelson did not have to establish Westchester Lace's lost sales and profits precisely, Edelson was required to provide the Court with a reasonable estimate. A reasonable estimate would have considered (and, presumably, ruled out) the market and other factors. Such a method may have also attempted to break down lost sales in some categorical manner, such as by customer

or by year. The Court cannot, on its own, attempt such a task. Since Edelson failed to prove a reasonable estimate, the Court will not grant Edelson lost sales or profits in any amount.

Therefore, Edelson's compensatory damage award for both claims is $2,293,000. To be clear, Edelson can only recover this amount once, whether it be pursuant to the breach claim or fraud claim; Edelson cannot have a double recovery of $4,586,000.

### 2. Punitive Damages

Edelson specifically requested punitive damages as to the fraud cause of action. *See* D.E. 184 ¶ 277. New Jersey's Punitive Damages Act states as follows:

> Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

N.J.S.A. § 2A:15-5.12(a). In *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, the New Jersey Supreme Court found that "[t]o warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and wilful [sic] disregard of the rights of another." 97 N.J. 37, 49 (1984) (quoting *DiGiovanni v. Pessel*, 55 N.J. 188, 191 (1970)).

"The theory behind punitive damages is to punish for the past event and to prevent future offenses, and the degree of punishment resulting from a judgment must be, to some extent, in proportion to the means of the guilty person." *McDonough v. Jorda*, 214 N.J. Super. 338, 349, 519 A.2d 874, 879 (App. Div. 1986) (citing Restatement (Second) of Torts § 908 cmt. d (1997)). Therefore, in assessing punitive damages, the trier of fact "must take into consideration the wealth of the defendants." *Id.* New Jersey's Punitive Damages Act codifies this holding, stating that in

making the determination of the amount of punitive damages, "the trier of fact shall consider all relevant evidence, including, but not limited to … [t]he financial condition of the defendant." N.J.S.A. § 2A:15-5.12(c).

While Edelson proved that Cheung's conduct was in bad faith and accompanied by a wanton and willful disregard of Edelson, Edelson failed to sufficiently establish Cheung's financial condition during trial.   There was very limited trial testimony regarding Cheung's personal financial condition.   Cheung's counsel elicited testimony during Cheung's direct examination regarding Cheung's current means of income and financial status. *See* Tr. Vol. 4 at 662:7-663:10. In response, Edelson's counsel objected on relevance grounds. *Id.*   The Court responded to Edelson's counsel, "[Y]ou are seeking punitive damages.  Don't I have to consider his net worth as far as punitive damages?" *Id.*  Edelson's counsel responded, "Well, that's a fair point, Your Honor.  I am seeking punitive damages.  So I'll withdraw that objection." *Id.*  Cheung then testified that he is "a wealthy man at heart" and is financially "sufficient" with "enough to survive, to eat." *Id.*

During the subsequent questioning of Cheung, Edelson's counsel asked about Cheung's current property ownership interests. *Id.* at 726:4-727:7.   It was established that during this litigation, Cheung sold a property that he owned in Queens; Cheung transferred his interest in another property that he owned with his wife to his wife; and the property interest Cheung had transferred to his wife was subsequently transferred back to Cheung. *Id.*  Cheung testified that he currently has an ownership interest in the property he had previously transferred to his wife. *Id.* However, Edelson did not establish the value of the ownership interest or any monetary amount for Cheung's financial condition.

Since "the degree of punishment resulting from a judgment must be, to some extent, in proportion to the means of the guilty person," the Court cannot determine an amount for punitive damages without sufficient evidence of Cheung's current financial condition. Therefore, the Court denies Edelson's request for punitive damages.

## IV.   CONCLUSION

For the reasons stated above, the Court enters judgment in favor of Plaintiff Leonard Edelson for the breach of the implied covenant of good faith and fair dealing claim and fraud claim. The Court awards Edelson $2,293,000 in damages on each count, but Edelson may only recover that amount rather than double the amount. An appropriate Order and Judgment accompanies this Opinion.

Dated: March 24th, 2020

JOHN MICHAEL VAZQUEZ, U.S.D.J.